UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

ABRAHAM PANYAGOR                                                                                    PLAINTIFF

v.                                                                        CIVIL ACTION NO. 3:16-CV-00401-CRS

KINDRED NURSING CENTERS
LIMITED PARTNERSHIP, D/B/A
KINDRED NURSING AND
REHABILITATION-BASHFORD                                                                         DEFENDANT

### **MEMORANDUM OPINION**

#### I.  Introduction

This case is before the court on defendant Kindred Nursing and Rehabilitation – Bashford's (hereinafter "Kindred") motion for summary judgment. ECF No. 35. Plaintiff Abraham Panyagor responded. ECF No. 43. Kindred subsequently replied. ECF No. 44. For the reasons set forth below, Kindred's motion will be granted.

#### II.  Factual Background

This case arises from Panyagor's termination from Kindred on August 10, 2015. ECF No. 43-2, p. 1. Panyagor began working at Kindred as a certified nursing assistant ("CNA") on June 2, 2014. ECF No. 35-3, p. 1. In approximately March 2015, Panyagor began having difficulties working with two of his colleagues, Serena James and Betris Sohn. ECF No. 35-2, p. 8. Panyagor alleges that after he received recognition as 'Employee of the Month,' James and Sohn began to bully him. *Id.* He claims that on at least one occasion, James used racial epithets when speaking to him, referring to him as a "Black African" and stating that she was going to "send [him] back to Africa." *Id.* Panyagor claims that he reported this incident to Kindred's Executive

Director of Nursing, Adam Mather. *Id.* at 12. According to Panyagor, Mather resolved the issue by reassigning Panyagor and James to different units. *Id.* at 19. Mather disputes this, stating that Panyagor never complained of racial discrimination or harassment, and that his reason for separating the two employees was that both stated that they were having difficulties working together. ECF No. 35-4, p. 2.

Panyagor also alleges that he witnessed James abuse a patient when they were working together. ECF No. 35-2, p. 6. He states that he also reported this incident to Mather, and that James was suspended from her job for two days as a result. *Id.* at 26. Again, Mather disputes this fact.[1]

On June 14, 2015, James called Kindred's employee hotline and complained that Panyagor was sexually harassing her. ECF No. 43-2, p. 1. She stated that "Panyagor, [a CNA], [was] creating an uncomfortable work environment for her . . . [by] making sexual comments toward her during work hours . . . [and] mak[ing] degrading comments towards the female [CNAs]." *Id.* On June 18, 2015, Kindred's Director of Nursing, Bobbie Shanks, was informed of James' complaint. ECF No. 43-2, p. 1. The following day, Shanks sent an email to Kindred's District Director of Human Resources, Stacey Baker, and Mather regarding James' complaint. ECF No. 35-9, p. 7. This email stated that she had attempted to contact Panyagor, but he was not at work that day. *Id.* It further stated that she would attempt to contact him again the following Monday. *Id.*

Kindred's employee records show that Panyagor took paid time off from June 15, 2015 to June 20, 2015. ECF No. 43-3, p. 1. Then, on July 2, 2015, Panyagor submitted a disability certificate from his doctor stating that he needed an additional twenty-eight days off work to

---

[1] There is no evidence in Kindred's employee records that James was ever suspended for patient abuse. ECF No. 35-4, p. 2.

2

undergo physical therapy for a back injury. ECF No. 35-10, p. 1. According to Panyagor, Kindred gave him this time off work without issue. ECF No. 35-2, p. 13.

On July 27, 2015, Baker realized that Panyagor was not listed in the company's system as taking a leave of absence, although he had been off work for several weeks. ECF No. 35-9, p. 9. She emailed Mather and Shanks about this issue, and also inquired as to whether Shanks had followed up with Panyagor regarding the sexual harassment allegation. *Id.* Shanks informed her that Panyagor was still off work and that she had not yet interviewed him. *Id.* As the District Director of Human Resources, Baker chose to resume the investigation into the sexual harassment allegation herself. *Id.* at 3.

Baker spoke to several individuals during the course of her investigation. Baker interviewed Sohn, who corroborated James' allegation that Panyagor sexually harassed her. ECF No. 35-9, p. 11. Sohn stated that on one occasion, she witnessed Panyagor walk up to James and "st[and] between her legs." *Id.* Baker then interviewed James, who confirmed her original allegation and acknowledged the incident that Sohn had described. *Id.* at 12. She also stated that another Kindred employee, Anne Baldwin, had been sexually harassed by Panyagor. *Id.* Baker then contacted Anne Baldwin, who stated that Panyagor was "extremely flirtatious" with all women at Kindred, and "had asked for her number and she told him no." *Id.* She stated that he then "found her on Facebook and sent her a text." *Id.* At that point, "she deleted him off of Facebook and blocked his number." *Id.* Baker also interviewed Panyagor while Panyagor was still off work. *Id.* at 11. Panyagor denied James' sexual harassment allegations, and stated that he had previously reported James for patient abuse and that she and Sohn were now ganging up on him. *Id.*

On August 4, 2015, Panyagor returned to work. ECF No. 35-9, p. 5. Although he returned to his position as a CNA, he was suspended that day pending the completion of the sexual harassment investigation. *Id.* On August 6, 2015, Baker spoke with Kindred's Divisional Vice President of Human Resources, Jane Matthews, about the interviews she had conducted. *Id.* Baker recommended to Matthews that Panyagor be terminated, and Matthews agreed. *Id.* Then, on August 10, 2015, Baker met with Mather. *Id.* Mather reviewed Baker's investigation notes, and ultimately agreed with her that Panyagor should be terminated. *Id.* Mather and Baker met with Panyagor that day and terminated him on the basis of sexual harassment. *Id.*; ECF No. 43-2, p. 1.

On June 2, 2016, Panyagor filed suit against Kindred, alleging discrimination in violation of the Americans with Disabilities Act ("ADA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), and the Kentucky Civil Rights Act ("KCRA"), retaliation in violation of Title VII, the KCRA, and the Family and Medical Leave Act (FMLA), and FMLA interference. ECF No. 1. According to Panyagor, Kindred terminated him for reporting discrimination, or alternatively, for taking FMLA leave. Kindred now moves for summary judgment.

### III. Legal Standard

The trial court shall grant summary judgment in a case "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the initial burden of "demonstrating that [there is] no genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party satisfies this burden, the burden then shifts to the nonmoving party to "point to evidence demonstrating that there *is* a genuine issue of material fact for trial." *Id.* at 323 (emphasis added).

In considering a motion for summary judgment, the court must consider the facts in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). There must actually be "evidence on which the jury could reasonably find for the [nonmoving] party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

IV.    Discussion

Kindred asserts that it is entitled to summary judgment on all of Panyagor's claims. Panyagor concedes that his claims for discrimination under the ADA, Title VII, and the KCRA fail as a matter of law. However, he maintains that his claims for retaliation under Title VII, the KCRA, and the FMLA, and his claim for interference under the FMLA must survive summary judgment because they contain issues of material fact. These arguments will be considered in further detail below.

  A. Claims for Retaliation Under Title VII and the KCRA

Kindred argues that Panyagor's claims for retaliation under Title VII and the KCRA fail as a matter of law. Kindred claims that Panyagor fails to establish a prima facie case of retaliation, and alternatively, that he fails to demonstrate that the reason given for his termination was pretext. Panyagor, by contrast, argues that he has established a prima facie case for retaliation and demonstrated pretext. Taking the facts in the light most favorable to Panyagor, the court agrees with Kindred.

5

i. <u>Prima Facie Case of Retaliation</u>

Title VII makes it unlawful for an employer to discriminate against any employee "because of the individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). The statute further prohibits an employer from retaliating against an employee "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). The KCRA likewise prohibits employment discrimination and retaliation. KRS §§ 344.040 and 344.280(1). To demonstrate a prima facie case of retaliation under Title VII or the KCRA,[2] the plaintiff must demonstrate by a preponderance of the evidence that:

1) he engaged in activity that Title VII [and the KCRA] protect;
2) the defendant knew that he engaged in this protected activity;
3) the defendant subsequently took an employment action adverse to the plaintiff; [and]
4) a causal connection between the protected activity and the adverse employment action exists. *Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2013).

The first and third elements of this claim are not in dispute. Therefore, the only issues in this case are whether Kindred knew that Panyagor engaged in protected activity and whether there was a causal connection between Panyagor's protected activity and the subsequent adverse employment action.

Panyagor fails to demonstrate a causal connection between his protected activity—his report of racial discrimination—and the subsequent adverse employment action—his termination. "To establish the causal connection required in the fourth prong, a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action

---

[2] Retaliation claims under the KCRA are evaluated using the same standard as retaliation claims under Title VII. *Montell v. Diversified Clinical Servs.*, 757 F.3d 497, 504 (6th Cir. 2014).

would not have been taken" had the plaintiff not engaged in the protected activity. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

The only evidence of causation Panyagor provides is the temporal proximity between his report of racial discrimination and his subsequent termination. Although the Sixth Circuit has held that temporal proximity alone can in some instances be enough to demonstrate causation, more evidence is required when the adverse employment action does not immediately follow the protected activity. *See Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) ("Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection. But where some time lapses between when the employer learns of the protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality"). In the present case, Panyagor alleges that he reported James' discriminatory statements to Mather in March 2015, but was not fired until August 2015. Given this five-month time lapse, more evidence is needed to support a finding of causation. Because Panyagor cannot establish a causal connection between his report to Mather and his subsequent termination, he fails to establish a prima facie case of retaliation. Thus, the court need not consider whether Kindred knew that Panyagor engaged in protected activity.

  ii.  <u>Pretext</u>

Assuming arguendo that Panyagor does make a prima facie showing of retaliation, he still fails to demonstrate that Kindred's reason for terminating him was pretext. Once a plaintiff establishes a prima facie case of retaliation, the defendant must demonstrate a legitimate, non-retaliatory reason for the adverse employment action. *See Romans v. Mich. Dep't of Human*

*Servs.*, 668 F.3d 826, 838-39 (6th Cir. 2012). If the defendant makes this showing, the burden shifts back to the plaintiff to show that the reason given was pretext. "[A] plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact; (2) that the proffered reasons did not actually motivate the employer's actions, or (3) that they were insufficient to motivate the employer's action." *Id.* at 839 (citing *Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 (6th Cir. 2009)).

Kindred satisfied its burden of providing a legitimate, non-discriminatory reason for its decision to terminate Panyagor—substantiated allegations that he sexually harassed female co-workers. Panyagor, however, claims that this was not the real reason he was terminated. Instead, he claims that he was terminated because he revealed to Baker that he had previously reported racial discrimination to Mather, and that Mather had failed to properly address this report. Thus, Panyagor argues that Mather chose to suspend and subsequently terminate him to cover up his own failures. There is no evidence in the record to support this assertion.

Moreover, there is substantial evidence that Kindred's investigation uncovered multiple complaints of sexual harassment against Panyagor. Under the 'honest belief rule,' "an employer's proffered reason is considered honestly held where the employer can establish it reasonably relied on particularized facts that were before it at the time the decision was made." *Seeger v. Cincinnati Bell Telephone Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012) (citing *Joostberns v. United Parcel Servs., Inc.*, 166 Fed. Appx. 783, 794 (6th Cir. 2006)). During Baker's investigation, two employees—James and Baldwin—reported that Panyagor had sexually harassed them. ECF No. 35-9, p. 12. These statements were corroborated by a third employee, Sohn. *Id.* at 11. Kindred's employee handbook expressly prohibits sexual harassment, and states that any violation of its policies could result in "separation of employment." ECF No.

8

35-5, pp. 1, 3. Based on this, Kindred acted reasonably in terminating Panyagor after the investigation was completed.

Panyagor fails to demonstrate that Kindred's reason for terminating him was pretext. Accordingly, Panyagor's claims of retaliation under Title VII and the KCRA fail as a matter of law.

B. Claim for Retaliation Under the FMLA

Kindred next argues that it is entitled to summary judgment on Panyagor's claim of retaliation under the FMLA. Kindred contends that Panyagor fails to establish a prima facie case of retaliation, and that even if he does, he cannot demonstrate that Kindred's reason for terminating him was pretext. Panyagor, by contrast, contends that he *has* established a prima facie case and demonstrated pretext. Viewing the facts in the light most favorable to Panyagor, the court agrees with Kindred.

i. Prima Facie Retaliation

The FMLA states that "eligible employees shall be entitled to a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). The statute also prohibits an employer from retaliating "against any individual for opposing any practice made unlawful by [the FMLA]." 29 U.S.C. § 2615(a)(2). To establish a prima facie case of retaliation under the FMLA, a plaintiff must demonstrate:

1) he was engaged in an activity protected by the FMLA;
2) the employer knew that he was exercising his rights under the FMLA;
3) after learning of the employee's exercise of FMLA rights, the employer took an adverse employment action; and
4) there was a causal connection between the protected FMLA activity and the adverse employment action. *Killian v. Yorozu Auto. Tenn. Inc.*, 454 F.3d 549, 556 (6th Cir. 2006).

Again, Kindred does not dispute the first or third elements of this claim. Thus, the only issues are whether Kindred knew Panyagor was exercising his rights under the FMLA, and whether there was a causal connection between Panyagor's FMLA protected activity and the adverse employment action.

Panyagor fails to demonstrate a causal connection between his FMLA leave and subsequent termination. He again relies on temporal proximity to demonstrate causation, as he was suspended the day after he returned from leave. As previously stated, temporal proximity alone can be sufficient in certain instances to demonstrate a causal link. *See Mickey*, 516 F.3d at 525. However, in this case there is ample evidence weighing against this inference. *See Nguyen*, 229 F.3d at 567 (…the fact of temporal proximity alone was not particularly compelling, because the plaintiff's retaliation case was otherwise weak, and there was substantial evidence supporting the defendant's version of events").

While Panyagor was out on leave, Kindred began an investigation into James' complaint of sexual harassment. At that time, an eye witness corroborated James' allegation, and another employee reported sexual harassment by Panyagor. ECF No. 35-9, pp. 11-12. When Panyagor returned to work, Kindred suspended him pending the completion of its investigation, which is consistent with its normal practice. ECF No. 35-4, p. 3. Once decision-makers at Kindred reviewed the results of the investigation, it was determined that Panyagor should be terminated for violating the company's sexual harassment policy. ECF No. 35-4, p. 3. This evidence outweighs any inference of causation created by temporal proximity. Panyagor has failed to produce sufficient evidence of a causal link between his FMLA leave and subsequent termination, and thus has not established a prima facie case of retaliation. It is therefore

unnecessary to consider whether Kindred knew Panyagor was exercising his rights under the FMLA.

   ii. Pretext

Even if Panyagor establishes a prima facie case of retaliation under the FMLA, he still fails to demonstrate that the reason provided by Kindred for his termination was pretext. Kindred asserts that Panyagor was terminated based on substantiated allegations that he sexually harassed co-workers. Panyagor claims that this reason was pretext, and that he was actually fired for taking FMLA leave. In support of this assertion, Panyagor notes that Mather knew of the sexual harassment claims against him in June, but did not terminate him until after he returned from leave in August.

In reality, the record demonstrates that from June to August 2015, Kindred conducted an investigation into the complaints of sexual harassment against Panyagor. ECF No. 43-2, p. 1. During the course of this investigation, it was revealed that multiple women accused Panyagor of sexual harassment. ECF No. 35-13, pp. 1-2. After the investigation was completed and the results were considered by Kindred's decision-makers, it was determined that Panyagor should be terminated. ECF No. 35-4, p. 3. The fact that Panyagor was not immediately discharged upon receipt of James' complaint does not show that this reason was pretext. To the contrary, it shows that Kindred attempted to verify these allegations before taking adverse employment action. Therefore, Panyagor's claim of FMLA retaliation fails as a matter of law.

C. FMLA Interference Claim

Finally, Kindred argues that it is entitled to summary judgment on Panyagor's claim of FMLA interference. Specifically, Kindred argues that Panyagor provides no evidence that he was denied any benefits under the FMLA, or that he suffered any harm. Panyagor disputes this,

claiming that Kindred failed to fully advise him of his rights under the FMLA and failed to restore him to his previous position. Taking the facts in the light most favorable to Panyagor, the courts agrees with Kindred.

The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]." 29 U.S.C. § 2615(a)(1). To establish a prima facie case for interference under the FMLA, a plaintiff must demonstrate that:

1) he was an eligible employee;
2) the defendant was an employer as defined under the FMLA;
3) [he] was entitled to take leave under the FMLA;
4) [he] gave the employer notice of [his] intention to take leave; and
5) the employer denied [him] FMLA benefits to which [he] was entitled. *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005).

Additionally, the plaintiff must demonstrate that the employer's violation caused him harm. *Edgar v. JAC Products, Inc.*, 443 F.3d 501, 507 (6th Cir. 2006). Kindred does not dispute the first four elements of this claim. Thus, the only issue is whether Kindred denied Panyagor FMLA benefits to which he was entitled.

Panyagor fails to demonstrate that Kindred denied him any benefits under the FMLA. Panyagor admits that Kindred gave him all of the time off work that he requested. ECF No. 44-1, p. 3. Further, Kindred's employee handbook—which was provided to Panyagor on the date he was hired—provides a detailed explanation of employees' rights under the FMLA. ECF No. 35-5, pp. 8-13. Although Panyagor claims that Kindred did not restore him to his original position after he returned from leave, this is an inaccurate representation of what actually occurred. In reality, Kindred held Panyagor's position open as required under the FMLA. However, he was suspended on the day that he returned to work because of the pending investigation into sexual harassment allegations against him. This is consistent with Kindred's normal practice. The fact

that Panyagor was subsequently terminated for sexual harassment does not mean that Kindred failed to return him to his position as a CNA following his leave. Panyagor fails to provide evidence that Kindred denied him benefits under the FMLA. Accordingly, his FMLA interference claim fails as a matter of law.

V. Conclusion

For the reasons set forth above, Kindred's motion for summary judgment will be granted. An order will be entered in accordance with this memorandum.

March 13, 2018

Charles R. Simpson III, Senior Judge
United States District Court